UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

05 CV 7279

------------------------------------X

CLIFDEN FUTURES, LLC,

                Plaintiff,

-against-

MAN FINANCIAL, INC.
    and
MAN GROUP, plc,

              Defendants.

------------------------------------X

Civil Action No._____

JUDGE PRESKA

**COMPLAINT**

RECEIVED
AUG 17 2005
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff, Clifden Futures, LLC ("Clifden" or "Plaintiff"), by its attorneys, Faust Rabbach & Oppenheim, LLP, for its Complaint against Defendants, Man Financial, Inc. ("Man" or "Defendant") and Man Group, plc ("Man Group" or "Defendant"), alleges as follows:

NATURE OF ACTION

      Clifden is a licensed Futures Commissions Merchant. Pursuant to a written Omnibus Agreement dated October 11, 2002, Clifden engaged Man as its clearing agent. Thereafter, Clifden opened an Omnibus Account (i.e., an account which combines the subaccounts of Clifden's customers).

      On the night of January 27th and the morning of January 28, 2004, a customer of Clifden's, Shimon Rosenfeld ("Rosenfeld"), sold short approximately 2,000 of the so-called "big" S&P futures contracts (the "S&P Contracts"), which equates to the short sale of securities of more than $550,000,000.00, on the Chicago Mercantile Exchange (the "Exchange" or the "CME") in a series of transactions stretching over a period of approximately

F:\1933-117\Complaint'Ver010.doc
DJR\mvk\08\15\05

eight (8) hours.   The short sales of more than 2,000 S&P Contracts, which were effected without Clifden's knowledge or authorization, were in violation of applicable laws, rules and regulations.   The Defendants failed to discharge their obligations to Clifden under the Omnibus Agreement and otherwise.   In particular, the Defendants knew, or should have known, that under applicable margin requirements, the $8,755,049.00 equity in the Omnibus Account was sufficient for the sale of only 440 S&P Contracts, which Rosenfeld had effected by around 11:00PM[1], January 27, 2004.   At approximately 1:10AM the morning of January 28, 2004, at which time Rosenfeld had sold approximately 830 S&P Contracts, the Exchange notified Man that excessive speculation and trading were taking place in the Omnibus Account.   Despite having been warned by the Exchange and despite having spoken to Rosenfeld, the Defendants did nothing to stop the short selling until approximately 2:36AM, at which point Rosenfeld had sold 2,022 S&P Contracts.

As a result of the Defendants' failure to properly discharge their obligations, the Omnibus Account sustained a loss of $2,626,012.50, which Clifden made good.   Clifden thereafter sent a demand letter seeking the recovery of the loss from Man.   Man then advised Clifden to transfer the Omnibus Account to another clearing firm.   Contrary to Man's agreement to supply certain equipment to Clifden at no charge, Man misappropriated $158,323.70 **belonging to Clifden's customers** from the Omnibus Account to pay itself the disputed fees.

Clifden seeks compensatory damages of $2,784,336.20 from the Defendants.   Clifden also seeks punitive damages in an

---

[1] All time references are to Central Standard Time.

amount sufficient to deter the Defendants, and other clearing firms, from ever again engaging in the misappropriation of customers' funds. Given the financial resources of the Defendants, punitive damages of not less than $25,000,000.00 should be imposed against them.

<u>THE PARTIES</u>

1.    Clifden Futures, LLC is a New York limited liability company, with its principal place of business located at 650 Fifth Avenue, 6th Floor, New York, New York. Clifden is a licensed Futures Commission Merchant.

2.    On information and belief, Man Financial, Inc. is a Delaware corporation, with its principal place of business located at One Financial Place, 44 South LaSalle Street, Chicago, Illinois and is a member of the CME, the National Futures Association ("NFA") and other self-regulating organizations.

3.    On information and belief, Man Group, plc is a corporation formed under the laws of the United Kingdom, with its principal place of business at Sugar Quay, Lower Thames Street, London EC3R 6DU, England and provides a full spectrum of financial services to its international customers.

4.    On information and belief, the business activities and finances of Man and Man Group are inextricably linked in general, and in particular with respect to the subject matter of this Complaint. For example, Man Group holds out on its website (www.mangroupplc.com) that Man Financial and its other

international companies and affiliates "make up the brokerage operations of Man Group, plc."

## JURISDICTION AND VENUE

5.   Jurisdiction of this Court is proper under 28 U.S.C. §§1332 and 1348 since there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Jurisdiction is also proper under 28 U.S.C. §1331. Specifically, the federal question arises under the Commodities Exchange Act, 7 U.S.C. §25, et. seq., because, inter alia, of the intentional and bad faith conduct of the Defendants; and other applicable laws, rules and regulations, including, but not limited to, the Rules of the CME.  The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. §1367.

6.   Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391 under Section 16 of the Omnibus Agreement and because the Plaintiff resides within this District and the Defendants maintain a place of business in this District.

## FACTUAL ALLEGATIONS

7.   On or about October 10, 2002, Clifden and Man entered into the Omnibus Agreement (a copy of which is annexed to this Complaint as Exhibit A), pursuant to which Man agreed to act as Clifden's agent (¶3) and to maintain an omnibus account for Clifden.  An omnibus account is defined as an account in which

the transactions of two or more customers are combined and carried in the name of Clifden, rather than separately (¶1.(d)).

8.   Pursuant to the Omnibus Agreement, Clifden opened Omnibus Account #E886-5678-88616 and at various times funds belonging to customers were deposited into, and withdrawn from, the Omnibus Account.

9.   Thereafter, Clifden and/or the customers engaged in transactions from time-to-time in the Omnibus Account, with respect to which Man acted as the clearing agent.

10.  Rosenfeld, one of Clifden's customers, but not an employee, officer or director of Clifden, had a subaccount within the Omnibus Account.   Rosenfeld regularly engaged in transactions through the Omnibus Account, including, but not limited to, dealing in S&P Contracts, usually somewhere between ten and twenty-five S&P Contracts.

11.  An S&P Contract is a financial instrument that is highly leveraged and is extremely volatile.   One "big" S&P Contract represents securities having a value of $280,000.00. Thus, the short sale by Rosenfeld of 2,022 S&P Contracts represents the short sale of securities having a value of more than $550,000,000.00.   The margin requirement for one S&P Contract is $19,688.00.

12.  At the close of "regular trading" on January 27, 2004, the market value for the entire Omnibus Account was $8,755,045.00.

13.   Starting at about 5:30PM on the night of January 27, 2004, after Clifden's office closed, Rosenfeld started selling S&P Contracts short.   The timing of his sales of the S&P Contracts is summarized below:

| Date | Time | Aggregate S&P Contracts Open In Omnibus Account |
|------|------|------|
| 1/27/2004 | 6:30pm | 84 |
| 1/27/2004 | 7:00pm | 100 |
| 1/27/2004 | 8:00pm | 176 |
| 1/27/2004 | 9:00pm | 222 |
| 1/27/2004 | 10:00pm | 377 |
| 1/27/2004 | 11:00pm | 440 |
| 1/28/2004 | 12:00pm | 690 |
| 1/28/2004 | 1:00am | 830 |
| 1/28/2004 | 2:00am | 1065 |
| 1/28/2004 | 2:15am | 1345 |
| 1/28/2004 | 2:30am | 1864 |
| 1/28/2004 | 2:36am | 2022 |

14.   On information and belief, through the night of January 27, 2004 and the morning of January 28, 2004, Man received, or should have received, information regarding Rosenfeld's trading in the S&P Contracts on a "real-time" basis.

15.   By 11:00PM on January 27, 2004, Rosenfeld had sold approximately 440 S&P Contracts.   Since the margin for one S&P Contract was $19,688 and the equity in the entire Omnibus Account was only $8,755,049.00, Man should have had systems and procedures in place to prevent Rosenfeld from effecting any

additional trades from and after that time.  However, Rosenfeld was able to continue selling S&P Contracts.

16.  On information and belief, at approximately 1:10AM on January 28, 2004, Man received a phone call from the Exchange alerting it that excessive and speculative trading was taking place in the Omnibus Account.  At that time, Rosenfeld had sold approximately 830 S&P Contracts short, which would have required margin of $16,341,040.00.

17.  Notwithstanding the warning from the Exchange, Man did nothing to prevent Rosenfeld from continuing to effect sales of the S&P Contracts in the Omnibus Account.

18.  Rather, on information and belief, Man contacted Kevin Davis, a Managing Director of Man Group in London, to deal with the short sales of the S&P Contracts that are the subject matter of this Complaint.

19.  On information and belief, it was not until approximately 2:36AM on January 28, 2004 that the Defendants froze the Omnibus Account.

20.  Between the time Man received the warning from the Exchange (1:10AM) and the time the Defendants finally froze the Omnibus Account (2:36AM), Rosenfeld sold an additional 1,192 S&P Contracts short, so that the number of S&P Contracts that he had sold over the eight hour period aggregated 2,022 S&P Contracts, the margin requirements with respect to which were approximately $40,000,000.00.

21.   On information and belief, employees of Man and Man Group spoke to Rosenfeld on one or more occasions during the night of January 27, 2004 and the morning of January 28, 2004 regarding his short sales of the S&P Contracts.   Despite these conversations, Rosenfeld was allowed to continue his short sales of the S&P Contracts until 2:36AM.

22.   By letter dated April 29, 2004, Clifden's then counsel requested Man to insure that all records relating to Rosenfeld's account, "whether oral, written, taped, electronic or otherwise be preserved...."

23.   The 2,022 S&P Contracts were closed out later on January 28, 2004, resulting in a loss of $2,626,012.50.

24.   On information and belief, Man willfully and intentionally failed to properly supervise the Omnibus Account and did not have proper systems and procedures in place to prevent the short sale of more than 2,000 S&P Contracts, as required by the Rules of the CME, including, but not limited to:

> *Rule 901M - which requires a CME Member to properly supervise trading on any electronic terminals it may sponsor.

> *Rule 903 - which requires a CME Member to have written procedures in place for account monitoring on an intra-day basis and ensuring order entry systems having automated credit controls or position

limits or that require the CME Member to enter orders.

25. In addition, on information and belief, Man willfully and intentionally failed to properly supervise the Omnibus Account by not having trading limits on the Omnibus Account.

26. Despite Clifden's demand to Rosenfeld that he put sufficient funds into the Omnibus Account to cover the $2,626,012.50 trading loss, he failed to do so.

27. In order to prevent other customers of Clifden who participated in the Omnibus Account from bearing the loss, Clifden contributed $2,626,012.50 to the Omnibus Account to cover the loss.

28. Clifden sent a demand letter dated April 1, 2005 to Man seeking recovery of the loss; a copy of the demand letter is annexed to this Complaint as Exhibit B.

29. Man thereafter advised Clifden to transfer the Omnibus Account to another clearing broker.

30. Contrary to Man's agreement to supply Clifden certain equipment at no charge, and despite the fact that Man had signed a so-called "segregated funds agreement" (copy annexed to this Complaint as Exhibit C), as required by law, that all funds in the Omnibus Account belonged to Clifden's customers, Man willfully and intentionally misappropriated an aggregate of $158,323.70 from the Omnibus Account, **which monies belonged to Clifden's customers**, to pay itself the disputed fees.

31. In order to prevent customers of Clifden who participated in the Omnibus Account from bearing the loss resulting from the Defendants' misappropriation of customers' funds, Clifden contributed an additional $158,323.70 to the Omnibus Account.

32. By letter dated June 17, 2005 (a copy of which is annexed to this Complaint as Exhibit D), Clifden again demanded that Man repay it the entire trading loss and also demanded that Man repay the $158,323.70 of customers' funds that it had misappropriated from the Omnibus Account.   However, Man has failed to pay any monies to Clifden.

33. On information and belief, the Net Income of Man Group for the fiscal years ended March 31, 2005 and 2004 was approximately US$880,000,000.00 and US$821,000,000.00, respectively, and its Shareholders' Equity as at March 31, 2005 was US$2,424,000,000.00.

<u>FIRST CAUSE OF ACTION</u>
<u>BREACH OF CONTRACT</u>

34. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 33 as if fully set forth herein.

35. Defendants breached their obligations under the Omnibus Agreement by not having proper systems and procedures in place, which, had they existed, would have resulted in Clifden's not sustaining the loss of $2,626,012.50.

36.  By reason of the foregoing, Defendants are liable to the Plaintiff in the amount of $2,626,012.50.

## SECOND CAUSE OF ACTION
### NEGLIGENCE

37.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 33 as if fully set forth herein.

38.  Defendants' failure to properly supervise the Omnibus Account; to otherwise exercise due care in connection with the transactions that are the subject matter of this action; and to not have proper systems and procedures in place as a clearing agent, was willful or at a minimum constituted gross negligence.

39.  By reason of the foregoing, Defendants are liable to the Plaintiff in the amount of $2,626,012.50.

## THIRD CAUSE OF ACTION
### VIOLATION OF APPLICABLE LAWS, RULES AND REGULATIONS

40.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 33 as if fully set forth herein.

41.  Upon information and belief, Defendants, as a licensed clearing firm, are subject to the provisions of the Commodities Exchange Act, 7 U.S.C. §25, et. seq.; to the rules and regulations of various commodities exchanges, including, but not limited to, the CME; and the Commodities Futures Trading

Commission and various self-regulatory organizations, such as the National Futures Association ("NFA").

42.  Upon information and belief, Defendants failed to have proper systems and procedures in place, as required by such laws, rules and regulations, which, had they existed, would have prevented Rosenfeld from engaging in the short sale of 2,022 S&P Contracts and from violating applicable margin and other regulatory requirements.

43.  By reason of its violation of applicable statutes, rules and regulations, Man caused Clifden to sustain damages of $2,626,012.50, which amount is owed by Defendants to Clifden.

FOURTH CAUSE OF ACTION
MISAPPROPRIATION AND CONVERSION OF FUNDS

44.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 33 as if fully set forth herein.

45.  As previously described in this Complaint, when the Omnibus Account was opened, Man executed and delivered a so-called "segregated funds agreement" (a copy of which is annexed to this Complaint as Exhibit C) in which Man acknowledged that all of the funds in the Omnibus Account belonged to Clifden's customers and expressly agreed that all funds in the Omnibus Account would

> "not be subject to [Man's] lien or offset for or on account of any indebtedness or liability now or hereafter owing by

> [Clifden] to [Man] otherwise than as the
> result of transactions made for such account
> and shall not be applied by [Man] upon any
> such indebtedness or liability except as to
> margin trades made for this account."

46. Despite having executed and delivered the so-called "segregated funds agreement," Defendants acted recklessly and in bad faith in their willful and intentional conversion and misappropriation of $158,323.70 **that belonged to Clifden's customers** to pay itself fees that were disputed and which, even if due, were owed by Clifden.

47. By reason of the foregoing, the Defendants violated the Commodities Exchange Act, 7 U.S.C.§25(a)(3)(B) and New York State Law, and are therefore liable to the Plaintiff in the amount of $158,323.70.

## FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTIES

48. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 to 33 and 44 to 47 as if fully set forth herein.

49. Pursuant to the Omnibus Agreement, Man was Clifden's agent. As such, it occupied a position of confidence and trust and owed Clifden and its customers the highest degree of fair dealing and good-faith conduct.

50. As a result of Man's willful and bad faith misappropriation of Clifden's customers' funds, Man breached its fiduciary duties to Clifden and its customers.

WHEREFORE, Clifden demands judgment against the Defendants, as follows:

i) Compensatory damages in the aggregate amount of $2,784,336.20, together with interest from and after January 28, 2004;

ii) Punitive damages of at least $25,000,000.00 to deter the Defendants, and other clearing firms, from misappropriating funds belonging to customers for their own benefit;

iii) For Clifden's costs and disbursements in bringing this action, including, without limitation, attorney fees; and

iv) For such other and further relief as may be deemed just and proper.

Dated:      New York, New York
            August 15, 2005

                              **FAUST RABBACH & OPPENHEIM, LLP**


                              By: _____
                              David J. Rabbach, Esq. (DR1764)
                              Attorneys for Plaintiff
                              Clifden Futures, LLC
                              488 Madison Avenue, 10th Floor
                              New York, New York 10022
                              Tel: (212) 751-7700
                              Fax: (212) 371-8410
                              E-mail: davidrabbach@frolaw.com

# EXHIBIT A





**MAN FINANCIAL INC**
**www.manfinancial.com**

Two World Financial Center, 27th Floor
New York, New York 10281-2700

One Financial Place, 20th Floor
440 South LaSalle Street, Chicago, IL 60605-1028

Man Financial Inc
Two World Financial Center / 27th Floor
New York, New York  10281-2700

Gentlemen:

In consideration of your agreeing to act as carrying broker and to maintain one or more omnibus accounts for the undersigned (hereinafter, the "Originating Broker"), the Originating Broker agrees with you as follows:

## 1.   *Definitions*

As used in this agreement, the following terms shall have the meanings indicated:

(a)   "Affiliate" shall mean any corporation, partnership or other organization which controls, is controlled by, or is under common control with you.

(b)   "Exchange" shall mean any contract market, exchange, board of trade or other market on or subject to the Rules of which transactions are effected under this Agreement, as well as any clearing house associated with such contract market, exchange, board of trade or other market.

(c)   "Governmental Regulations" shall mean any rule, regulation, ruling or order of the Commodity Futures Trading Commission (hereinafter, the "CFTC") or any other United States or non-United States governmental body, and any interpretation thereof rendered by such body or by the staff thereof.

(d)   "Omnibus Account" shall mean an account carried by you in which the transactions of two or more persons in futures, commodity forward contracts, physical commodities and/or commodity options are combined and carried in the name of the Originating Broker rather than separately.

(e)   "Property" shall mean property of every kind and nature, real and personal, and shall include without limitation money (in either U.S. or foreign currency), securities, physical commodities, contracts for the future or forward delivery of any commodity, options on securities, options on physical commodities, or options on contracts for the future or forward delivery of any commodity, and any equity in any of the Originating Brokers' accounts with you or any of your affiliates.

(f)   "Rule" shall mean any provision of the constitution, charter, certificate of incorporation, articles, by-laws, rules, regulations, rulings, interpretations and resolutions, as well as any custom, usage, practice or procedure, of any Exchange or any Self-Regulatory Organization.

(g)   "Self-Regulatory Organization" shall mean any commodity or securities self-regulatory organization, including, without limitation, the National Futures Association ("NFA") , the National Association of Securities Dealers, Inc., and the Municipal Securities Rulemaking Board.

2.  *Representations and Warranties*

The Originating Broker represents and warrants that:

(a)  The Originating Broker has the legal capacity and full authority to enter into this Agreement.

(b)  The Originating Broker has the status of either (a) a futures commission merchant or introducing broker duly registered with the CFTC and a member in good standing with the NFA or (b) a foreign broker not required to be registered by the CFTC. The Originating Broker will promptly notify you if said status changes.

(c)  The Originating Broker is duly licensed and authorized to conduct business as such in each jurisdiction in which it conducts such business.

(d)  The Originating Broker is and at all times during the term hereof will remain in full compliance with all applicable rules and regulations of the CFTC and of each jurisdiction in which it conducts business.

(e)  If required by Government Regulations, the employees and principals of the Originating Broker are appropriately registered with the CFTC (or otherwise) or have made such filings as are required by the CFTC.

(f)  Except as may have been disclosed to you in writing, the persons on whose behalf transactions will be effected pursuant to this Agreement will not include any officer, director, employee, or other "affiliated person" (as such term is defined in any applicable Government Regulations) of any Exchange, or Self-Regulatory Organization, or of any member firm of any Exchange. In the event that any customer becomes such an officer, director, employee or other affiliated person, the Originating Broker will forthwith notify you thereof in writing and will deliver to you a duly executed consent of the employer permitting trading of the customer's accounts with the Originating Broker.

(g)  All of the information furnished to you by the Originating Broker in connection with entering into this Agreement is complete, true and accurate.

3.  *Appointment as Agent*

You are hereby designated as an agent of the Originating Broker for the purpose of executing transactions for any Omnibus Account, and you are authorized to make such advances and expend such monies and, whenever necessary or proper, to borrow and deliver such Property as may be required with respect to transactions in any Omnibus Account.

4.  *Applicable Rules*

All transactions shall be subject to the Rules of the Exchange on or subject to the Rules of which such transactions are executed, and shall also be subject to any law or Governmental Regulation applicable thereto.

## 5.   *Commission and Fees*

The Originating Broker understands that you charge commissions for the execution of commodity transactions based on your commission rates in effect at the time of liquidation, and the Originating Broker agrees to pay such brokerage commissions and other such charges as you shall establish from time to time (whether other originating brokers or customers of yours pay lower commissions or charges) and to pay any costs or expenses incurred in connection with transactions in any Omnibus Account, including, without limitation, any taxes, transaction fees, charges, fines, penalties or other expenses imposed by the any Exchange, Self-Regulatory Organization or governmental authority. You may charge such commissions or impose such other charges at any time and from time to time, without regard to the commissions or other charges you establish for any other originating broker or any customers of yours. Without limiting the generality of the foregoing, debit balances in any Omnibus Account will be charged with interest at a rate equal to the prime rate as quoted by The Wall Street Journal from time to time.

## 6.   *Margins and Premiums*

(a)   The Originating Broker will maintain original, maintenance and option margin in such forms and amounts as you may required in your sole and absolute discretion, in any Omnibus Account. If at any time you determine that additional margin is required, the Originating Broker will deposit such additional margin with you upon demand; provided, however, that notwithstanding any such demand, you may at any time proceed in accordance with Section 7 of this Agreement. You may in your sole and absolute discretion change your margin requirements at any time and from time to time, irrespective of the margins required by any Exchange and irrespective of the margins you require from any other originating broker or any other customers of yours. No margin level required at any time shall constitute a precedent for any margin level required at any future time.

(b)   The Originating Broker will promptly deposit the premium required in connection with the purchase of any option for any Omnibus Account.

## 7.   *Security: Remedies on Default*

(a)   As security for the timely payment and performance in full of all obligations of the Originating Broker to you arising in connection with any Omnibus Account and any transaction effected therein under this Agreement, the Originating Broker hereby pledges and assigns to you, and grants you a lien on and security interest in, all Property whatsoever in such Omnibus Account or otherwise in your or any Affiliate's custody or control at any time or for any purpose (whether held as margin, or for safekeeping or otherwise). The Original Broker will take such actions and execute and deliver such documents as you may reasonably require from time to time to perfect the lien and security interest granted hereunder.

(b)   In the event that:

    (i)   The Originating Broker commences a voluntary case, or an involuntary case is commenced against the Originating Broker, under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a receiver, liquidator, trustee, custodian, sequestrator or other similar official is appointed or takes possession (before or after the commencement of any such voluntary or involuntary case) of the Originating Broker or of any property of the Originating Broker, or the Originating Broker is insolvent, makes any general assignment for the benefit of creditors, or fails generally to pay debts as they become due, or any similar events shall occur;

    (ii)   The Originating Broker (if a corporation, partnership or other entity) shall take any corporate or other action to effect a dissolution, reorganization, winding up of its affairs or other similar events;

    (iii)   The Originating Broker (if individual) shall die or shall be judicially declared incompetent;

    (iv)   The Originating Broker shall fail or refuse to pay margin or any other sum as and when due you pursuant to this Agreement or shall breach or default in the performance of any other obligation of the Originating Broker under this Agreement;

    (v)   You determine, in your sole and absolute discretion, with or without regard to market quotations, that any collateral or margin deposited with you to secure any Omnibus Account is inadequate, or;

    (vi)   You determine, in your sole and absolute discretion, that it is necessary and appropriate for any other reason;

then, and in any such event, you may at your election take any one or more of the following actions (in addition to any other rights or remedies you may have at law, in equity, under this Agreement or otherwise):

    (A)   Sell, exercise, offset or otherwise liquidate any or all Property in any Omnibus Account with you or any Affiliate;

    (B)   Buy in, offset or otherwise liquidate any or all Property short in the Omnibus Account with you or any Affiliate;

    (C)   Buy or sell Property or enter into and/or liquidate, straddle or spread positions, in order to liquidate or reduce the risk associated with carrying any Property long or short in any Omnibus Account with you or any Affiliate;

    (D)   Cancel any outstanding orders, close out any or all outstanding contracts, close any Omnibus Account with you or any Affiliate, sell, set off against or otherwise dispose of any Property relating to any Omnibus Account in your or any Affiliate's custody or control (whether held as margin or for

safekeeping, or otherwise) and satisfy any obligation to you arising with respect to such Omnibus Account or any transaction or position therein out of any such Property or the proceeds from the sale or other disposition thereof; or

(E)   Exercise all rights and remedies of a secured party under the Uniform Commercial Code and other applicable law.

Any action referred to herein may be taken without demand for margin or additional margin, and without notice to the Originating Broker (or to the heirs, executors, administrators, legatees, personal representatives, successors or assigns of the Originating Broker) of sale or purchase, or other notice of advertisement (except such notice as may be required by law). Any purchase, sale, offset or liquidation of Property may be made according to your judgement and in your sole and absolute discretion either by direct sale or purchase in the same market and for delivery in the same month, or in another market or another month, or by spread or straddle transactions, and may be made in your sole and absolute discretion on any Exchange or other recognized market or elsewhere as you deem appropriate. In the event that the Property held and applied by you pursuant to this Agreement is insufficient for the payment in full of all liabilities of the Originating Broker due to you and any Affiliates, the Originating Broker shall remain liable for and shall promptly pay the deficit upon demand, together with interest thereon and all costs of collection (including without limitation attorney's fees and expenses).

(c)   All Property in any Omnibus Account may be delivered by you to third parties in repurchase transactions, and may be pledged, repledged, hypothecated or re-hypothecated, without notice to the Originating Broker and without any obligation to pay to the Originating Broker, or to account to the Originating Broker for, any interest, income or benefits that may be derived therefrom, and may be deposited by you in your general bank account and commingled with property of any other person, in any manner consistent with applicable laws, Governmental Regulations and Rules of any Exchange or Self-Regulatory Organization.

## 8.   *Liquidating Instructions*

At least five business days prior to the first notice day in the case of long positions in open futures contracts, and at least five business days prior to the last trading day in the case of short positions in open futures contracts, and at least five business days before the expiration date of long positions in open commodity options, the Originating Broker will either give you instructions to liquidate or make or take delivery under such futures contracts or to liquidate, exercise or allow the expiration of such options, and will deliver to you sufficient funds and/or any documents acquired in connection with any such exercise. If such instructions or such funds and/or documents are not received by you by the time hereinbefore specified, you may, without notice to the Originating Broker, either exercise or liquidate any or all such positions, or make or receive delivery on behalf of the Originating Broker, or allow commodity options to expire, all upon such terms and by such methods as you may determine in your sole and absolute discretion.